IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

TAYLOR BELL and DORA BELL,
Individually and as Mother of Taylor Bell,                                         PLAINTIFFS,

VS.                                          CIVIL ACTION NO. 1:11CV00056-NBB-DAS

ITAWAMBA COUNTY SCHOOL BOARD,
TERESA MCNEECE, Superintendent of
Education for Itawamba County, Individually
and in Her Official Capacity, and TRAE WIYGUL,
Principal of Itawamba Agricultural High School
Individually and in His Official Capacity,                                         DEFENDANTS.

MEMORANDUM OPINION

These matters come before the court upon the parties' cross-motions for summary judgment. After due consideration of the motions and the responses filed thereto, the court is prepared to rule.

I. FACTUAL BACKGROUND

In August 2001, while a senior at Itawamba Agricultural School, Taylor Bell composed, sang, and recorded a rap song which he published for over 1,300 "friends" on Facebook.com and for an unlimited audience on YouTube.com. In clearly vulgar language, the rap song criticizes two coaches at school – Coach Wildmon and Coach Rainey – by alleging that both of them had improper contact with female students. The last two verses include the phrases:(1) "looking down girls' shirts / drool running down your mouth / messing with wrong one / going to get a pistol down your mouth" and (2) "middle fingers up if you can't stand that nigga / middle fingers up if you want to cap that nigga."[1]

---

[1] For purposes of clarity, there are no allegations of racism in relation to the use of the term "nigga" throughout the subject song.

After the school became aware of the song, Taylor Bell was taken out of class on January 7, 2011 and met with Principal Trae Wiygul, District Superintendent Teresa McNeese, and the school board attorney who accused him of making threats and false allegations. Taylor Bell denied making threats but confirmed that the allegations of improper contact with female students were true. After the meeting, Principal Wiygul drove Taylor Bell to a friend's house rather than allowing him to attend his remaining classes for the day.

The school cancelled classes until Friday, January 14, 2011 due to inclement weather. On that Friday Mr. Bell returned to school. After his last class that day, the assistant principal's office called for Taylor Bell and told him he would be suspended indefinitely pending a hearing.

The Disciplinary Committee of the Itawamba County School Board held a hearing on January 26, 2011 after providing notice to Taylor Bell and his mother Dora Bell via letter. Taylor Bell attended the hearing with his mother and his own counsel. The Committee concluded that Taylor's conduct of writing and recording the song and publishing the song on Facebook.com and YouTube.com constituted "harassment and intimidation of teachers and possible threats against teachers." The Committee decided to suspend Taylor Bell for seven days and to transfer him to an alternative school for the five weeks remaining of the nine-week school period.

On February 7, 2011 the Itawamba County School Board held a hearing on Taylor Bell's appeal of the Disciplinary Committee's findings and punishment. The school board upheld the punishment and affirmed that Taylor Bell "threatened, harassed, and intimidated school employees" with the publication of his song.

One week later on February 14, 2011 Dora Bell filed her Complaint on behalf of her son Taylor Bell and herself. Count 1 alleges that Taylor Bell's punishment violated his First Amendment

2

right to free speech. Count 2 alleges that his punishment violated Dora Bell's parenting rights guaranteed by the Fourteenth Amendment Due Process Clause. Count 3 alleges that Taylor Bell's speech was entitled to heightened protection as speech on a matter of public concern. Count 4 alleges that Taylor's punishment for exercising his right to free speech violated Mississippi law.

On March 2, 2011 the plaintiffs filed a motion for preliminary injunction seeking to require the Itawamba School Board to allow Taylor Bell to return from the alternative school before the required five week period expired pursuant to his punishment. This court held a hearing on March 10, 2011. On March 14, 2011 the court entered an Order denying the motion for preliminary injunction as moot since the plaintiff's time in alternative school was set to expire on March 11, 2011 – one day after the hearing.

By Order of May 9, 2011 the court instructed the parties to file cross motions for summary judgment within 90 days. The motions for summary judgment have been fully briefed since August 2011. Neither party argued Count 3 as a separate count, but rather as part and parcel to the free speech claim. Furthermore, since the briefs do not discuss the alleged violation of Mississippi laws protecting free speech, the court considers Count 4 as abandoned. Accordingly, at issue are Counts 1 and 2.

The Order of May 9, 2011 also concluded that: "Having conducted a case management conference and having discussed the case with the parties, it appears there are no factual issues and that this case should be resolved by summary judgment." The issues remaining are matters of law which will be resolved by applying the law to the undisputed facts.

3

II. DISCUSSION

A. Summary Judgment Standard

Summary judgment should be entered only if "[t]here is no genuine issue as to any material fact *and* ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added). The primary focus for the court in ruling upon a motion for summary judgment is usually whether there is at least one issue of material fact warranting a trial. In this matter, however, the parties have agreed that there are no remaining issues of fact. Thus, it falls upon the court to determine which party is entitled to judgment "as a matter law."

B. First Amendment Claim

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). However, the constitutional rights of students in public school "are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. N. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Though free speech rights are available to teachers and students in public schools, such rights must be "applied in light of the special circumstances of the school environment." *Tinker*, 393 U.S. at 506.

Pursuant to the U.S. Supreme Court's decision in *Tinker*, "conduct by a student, *in class or out of it* which for any reason ... *materially disrupts classwork* or involves *substantial disorder* or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 506 (emphasis added).

The Fifth Circuit in *Porter v. Ascension Parish School Board*, 393 F.3d 608 (5th Cir. 2004) held that a student's sketch depicting a violent siege at school could not be regulated by the school

because it was drawn at home and not on campus, kept in his closet for two years, and only made it to school unintentionally when his younger brother took it to school. However, the Court did not rule in *Porter* that off-campus speech by students cannot be regulated by the school. Rather, the Court specifically observed that its analysis was not in conflict with other courts having applied *Tinker* to off-campus speech because "the fact that Adam's drawing was composed off-campus and remained off-campus for two years until it was unintentionally taken to school by his younger brother takes the present case outside the scope of these precedents." *Porter*, 393 F.3d at 615 n. 22.

In any event, as emphasized above, the U.S. Supreme Court in *Tinker* specifically ruled that off-campus conduct causing material or substantial disruption at school can be regulated by the school. The Fifth Circuit in *Porter* appears to have added a requirement that the speech be intended to reach school. In this case, Taylor Bell clearly intended to publish to the public the content of the song as evidenced by his posting of the song on Facebook.com with at least 1,300 "friends," many of whom were fellow students, and to an unlimited, world-wide audience on YouTube.com. Accordingly, the *Tinker* standard applies to Taylor Bell's song without regard to whether it was written, produced, and published outside of school.

Importantly, courts have held that the *Tinker* material or substantial disruption standard can also apply to allow regulation of student speech when the disruption is reasonably foreseeable.

In *Wisniewski v. Board of Education of Weedsport Central School District*, 494 F.3d 34 (2d Cir. 2007), a student was suspended after instant messaging on the internet at home a picture displaying a drawing of a pistol firing a bullet at a person's head, above which were dots of blood, and beneath was the word "kill" followed by the name of the student's English teacher. The student was not on school property and only sent the images to his friends.

5

The Second Circuit used the *Tinker* substantial disruption standard rather than the "true threat" standard enunciated in *Watts*[2], concluding that school officials had more authority over students' speech than the government had over the adult plaintiff in *Watts*. *Wisniewski*, 494 F.3d at 38.

The Second Circuit in *Wisniewski* concluded:

> We are in agreement ... that, on the undisputed facts, it was *reasonably foreseeable* that the IM icon would come to the attention of school authorities and the teacher whom the icon depicted being shot. The potentially threatening content of the icon and the extensive distribution of it, which encompassed 15 recipients, including some of Aaron's classmates, during a three-week circulation period, made this risk at least *foreseeable* to a reasonable person, if not inevitable. And there can be no doubt that the icon, once made known to the teacher and other school officials, would *foreseeably* create a risk of substantial disruption within the school environment.

*Wisniewski*, 494 F.3d at 39-40 (emphasis added).

In *Boim v. Fulton County School District*, the Eleventh Circuit held that violent student speech was not protected after concluding it "clearly caused and was reasonably likely to further cause a material and substantial disruption" at the school. 494 F.3d 978, 983 (11th Cir. 2007).

The student in *Boim* wrote a story about a dream she allegedly had of shooting her teacher. The student wrote the story in her notebook and gave the notebook to another student while at school. Her teacher, who may have been the target of the story, gained possession of the story while in class and discussed it with a school administrator shortly after school. On the next day, the teacher brought the story to the administrator who then consulted the school's police officer. The school

---

[2] In *Watts v. United States*, 394 U.S. 705, 707 (1969), the U.S. Supreme Court held that the defendant's alleged statement that he would refuse induction into armed forces and 'if they ever make me carry a rifle the first man I want in my sights is L.B.J.' did not amount to a "true threat" against the life of the President of the United States. Rather, the statement was held to be hyperbole and was protected free speech.

pulled the student from class and called her parents. At the meeting, the student denied the story was serious and her parents supported her. The school sent the student home. The principal continued the investigation out of concerns of prior violence in other schools such as Columbine. During this investigation, the teacher was shown the narrative and said he felt threatened. The school suspended the student for ten days and then expelled her. The district superintendent, however, overturned the expulsion but upheld the suspension.

The Eleventh Circuit in *Boim* observed that there is "no First Amendment right allowing a student to knowingly make comments, whether oral or written, that reasonably could be perceived as a threat of school violence, whether general or specific, while on school property during the school day." *Boim*, 494 F.3d at 984. Though the Court referenced only on-campus speech, the ultimate conclusion of the court is equally applicable to off-campus student speech as explicitly recognized in *Tinker*. The Eleventh Circuit concluded:

> Rachel's first-person narrative could reasonably be construed as a threat of physical violence against her sixth period math teacher. That Rachel does not appear to have purposely disseminated the narrative is immaterial in this context. By taking the narrative to school and failing to exercise strict control over the notebook in which it was written, Rachel increased the likelihood to the point of certainty that the narrative would be seen by others, whether by other students or a teacher. Consequently, Rachel created an appreciable risk of disrupting [her school] in a way, regrettably, is not a mater of mere speculation or paranoia.

*Boim*, 494 F.3d at 985.

Thus, in *Boim*, the substantial or material disruption was that the content of the student's speech reached the school to at least one other student, and ultimately to the threatened teacher and school officials. There was no evidence cited by the Court in *Boim* of any further disruption at school - *e.g.*, panic among students or teachers, calls by parents, closing of school, etc.

Another example where reasonably foreseeable substantial or material disruption was found

to render student speech unprotected can be seen in *D.J.M. ex rel D.M. v. Hannibal Public School District No. 60*, 647 F.3d 754 (8th Cir. 2011). This case involved a high school student who communicated threats against fellow students to a friend via internet instant messaging. The Court held that such speech was not protected either under the *Watts* "true threat" analysis or *Tinker*'s material or substantial disruption analysis, given the ease with which such electronic communication could be forwarded.

Having considered the standards discussed above, the primary questions at hand are (1) whether Taylor Bell's song caused or tended to cause a material and/or substantial disruption at school or (2) whether it was reasonably foreseeable to school officials that the song would cause a material and/or substantial disruption at school. The language used by Bell is set forth below in a footnote.[3]

In addition to the many vulgar verses insulting the coaches and one of their wives as well as specific allegations of improper conduct towards female students, the two most threatening lyrics are: (1) "looking down girls' shirts / drool running down your mouth / messing with wrong one / going to get a pistol down your mouth" and (2) "middle fingers up if you can't stand that nigga / middle fingers up if you want to cap that nigga."

---

[3]As set out in the defendants' brief, Taylor Bell's song contained lyrics stating that Coach Wildmon is a "dirty ass nigger," is "fucking with the whites and now fucking with the blacks," is a "pussy nigger," is "fucking with the students he just had a baby," and is "fucking around cause his wife ain't got no titties." The song also states that Coach Wildmon tells female students they "are sexy" and the reason that the singer (Taylor Bell) quit the basketball team is because Coach Wildmon "is a pervert."

Regarding the other coach, the song states that Coach Rainey is another "Bobby Hill" (an Itawamba assistant football coach who was arrested and accused of sending sexually explicit material to a minor via text message in 2009), that he is a "pervert," that he is "fucking with juveniles," that he came to football practice "high," that he is 30 years old and is "fucking with students at the school," and that Taylor Bell is going to "hit ya with my ruler."

The court agrees with the respective findings of the Disciplinary Committee and the Itawamba School Board that the song – especially with regard to the two threatening lyrics quoted above – constitutes "harassment and intimidation of teachers and possible threats against teachers" and "threatened, harassed, and intimidated school employees."

The court further concludes that the subject lyrics in fact caused a material and/or substantial disruption at school and that it was reasonably foreseeable to school officials the song would cause such a disruption.

In terms of actual disruption, it is undisputed that Coach Wildmon heard of the song from a text message from his wife while he was at school. When Coach Wildmon asked the three seniors who were sitting near him at that time whether they had heard the song, they replied that they had and one of them allowed him to listen to the song on the student's cellular phone. Coach Wildmon was angered and complained to the principal. He testified at the preliminary injunction hearing that his teaching style had been adversely affected after knowledge of the song had spread because he perceived that students were wary of him. Coach Wildmon also testified that he felt threatened by the references to killing him in the song. Similarly, Coach Rainey testified that his teaching style has also been adversely affected out of fear students suspect him of inappropriate behavior.

In terms of foreseeable material or substantial disruption, it is reasonably foreseeable that a public high school student's song (1) that levies charges of serious sexual misconduct against two teachers using vulgar and threatening language and (2) is published on Facebook.com to at least 1,300 "friends," many of whom are fellow students, and the unlimited internet audience on YouTube.com, would cause a material and substantial disruption at school.

Public school students have free speech rights under the First Amendment, but not to the

same extent as adults. Students' free speech rights are tempered by the school's legitimate interest in maintaining order. As observed by the U.S. Supreme Court in *Tinker*, "the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." 393 U.S. at 507. Moreover, under *Tinker*, student speech may be prohibited if it causes a material and/or substantial disruption at school, or it is reasonably foreseeable that the speech will cause such a disruption.

The court finds that Taylor Bell's song caused a material and/or substantial disruption and it was reasonably foreseeable that such a disruption would occur. The song is not protected by the First Amendment, and the school did not err in punishing Bell for publishing it to the public. Therefore, Taylor Bell's claim that his First Amendment rights were violated by the school should be dismissed with prejudice.

With regard to Taylor Bell's argument that his speech should received heightened protection as commenting on matters of public concern, the court concludes that the plaintiff failed to demonstrate as a matter of law that such heightened protection overrides the well-established *Tinker* test in matters of public school student speech as opposed to adults. Accordingly, to the extend that this argument was meant to constitute a separate count as referenced in Count 3 of the Complaint, the court concludes that the claim should be dismissed with prejudice.

Finally, the court concludes that the individual defendants are entitled to qualified immunity given that the plaintiffs have failed to demonstrate that all reasonable officials in their position would have believed that Taylor Bell's song was clearly protected by the First Amendment. However, since the court has granted summary judgment on Taylor Bell's free speech claim, the

10

issue of qualified immunity is rendered moot.

**B. Dora Bell's Fourteenth Amendment Due Process Claim**

Dora Bell, Taylor Bell's mother, asserts a claim that the defendants violated her Fourteenth Amendment due process rights to determine how to best raise, nurture, discipline, and educate her child.

The Due Process Clause of the Fourteenth Amendment "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). However, "there may be circumstances in which school authorities, in order to maintain order and a proper educational atmosphere in the exercise of police power, may impose standards of conduct on students that differ from those approved by some parents." *Gruenke v. Seip*, 225 F.3d 20, 304 (3d. Cir. 2000). Should the school policies conflict with the parents' liberty interest, the policies may only prevail if they are "tied to a compelling interest." *Id*. at 305.

Dora Bell has not demonstrated through clear authority that the temporary five-week transfer to alternative school or the seven-day suspension were not tied to the school's compelling interest of a legitimate maintenance of school order.

Regarding notice, it is undisputed that Dora Bell received notice of the first hearing before the Disciplinary Committee via letter, that the hearing was moved to accommodate her schedule, and that she attended the hearing. She also reciived notice of the appeal hearing before the Itawamba School Board and attended that hearing.

As to the temporary five-week transfer to an alternative school, it was made clear in *Nevares v. San Marcos Consolidated Independent School District* that a transfer to an alternative school with

stricter discipline does not deny the student's access to a free public education and therefore does not violate a federal protected property or liberty interest. 111 F.3d 25, 26 (5th Cir. 1997).

With respect to the seven-day suspension, since the suspension was for less than ten days, Taylor Bell was only entitled to ""be given oral or written notice of the charges against him and, if he denies them, an explanation fo the evidence the authorities have and opportunity to present his side of the story." *Harris v. Pontotoc County School District*, 635 F.3d 685 (5th Cir. 2011) (quoting *Goss v. Lopez*, 419 U.S. 565, 574 (1975)). There is no particular delay or formality required, but there must have been at least "an informal give-and-take between student and disciplinarian." *Goss*, 419 U.S. at 582. In this case, both Taylor Bell and his mother were given oral and written notice of the charges against him. Taylor Bell was given two hearings during which he had the opportunity to give his side of the story while represented by counsel.

### III. CONCLUSION

For the reasons discussed above, the court concludes that the plaintiffs' motion for summary judgment should be denied. The court concludes further that the defendants' motion for summary judgment should be granted and that all of the plaintiffs' claims should be dismissed with prejudice. A Final Judgment shall issue forthwith,

THIS DAY of March 14, 2012.

/s/ Neal Biggers
NEAL BIGGERS
U.S. DISTRICT JUDGE

12